**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

---

KRIS M. WYNN,

                        Petitioner,

       v.

                                No. 9:19-CV-209
WILLIAM A. LEE,                      (BKS/CFH)

                       Respondent.

---

**APPEARANCES:**                        **OF COUNSEL:**

Kris M. Wynn
14-A-1671
Eastern New York Correctional Facility
Box 338
Napanoch, New York 12458
Petitioner pro se

Attorney General for the              PAUL B. LYONS, ESQ.
State of New York                    Assistant Attorney General
28 Liberty Street
New York, New York 10005
Attorney for Respondent

**CHRISTIAN F. HUMMEL**
**U.S. MAGISTRATE JUDGE**

### REPORT-RECOMMENDATION AND ORDER[1]

       Presently pending before the Court is a petition for a writ of habeas corpus filed

pursuant to 28 U.S.C. § 2254 by pro se petitioner Kris M. Wynn ("petitioner").  See

---

[1] This matter was referred to the undersigned for Report-Recommendation and Order pursuant to 28 U.S.C. § 636(b) and N.D.N.Y.L.R. 72.3(c).

Dkt. No. 38 ("Pet.").[2]  In February 2014, following a jury trial in the Clinton County Supreme Court, petitioner was convicted of two counts of criminal sale of a controlled substance in the third degree and three counts of criminal possession of a controlled substance in the third degree.  See Pet. at 1-2; see also People v. Wynn, 52 N.Y.S.3d 136, 138 (App. Div. 2017).  On April 17, 2014, petitioner was sentenced to sixteen-years' imprisonment followed by four years of post-release supervision.  See Pet. at 1; see also Wynn, 52 N.Y.S.3d at 138-39.

Petitioner now seeks a writ of habeas corpus pursuant to 28 U.S.C. § 2254 on the grounds that (1) police conducted a warrantless arrest based on "an imaginary informant tipster's information, nonexistent GPS locational data, and a roadside canine alert which turned up no contraband after an immediate vehicle search"; (2) the "prosecutor presented evidence of unrelated incidents" to the grand jury, resulting in the court issuing "an unauthorized warrant"; (3) the indictment and complaint were insufficient because they relied on "false material information"; and (4) trial counsel was ineffective.  Pet. at 5-13.  Respondent opposed the petition.  See Dkt. Nos. 48, 50. Petitioner filed a traverse.  See Dkt. No. 56.  For the reasons that follow, it is recommended that the petition be denied.

## I.  Background[3,4]

### A.  Investigation and Arrest

---

[2] The operative petition is petitioner's second amended petition.  See Dkt. Nos. 1, 13, 38.
[3] Citations to the record are to the pagination generated at the top of each page by CM/ECF.
[4] The undersigned summarizes only the procedural history that is relevant to this Court's review of the habeas petition.

On January 9 and 10, 2013, Detectives Christopher Maggy and Matthew Bell of the Adirondack Drug Task Force executed two controlled buys—one of cocaine and one of heroin—between petitioner and two confidential informants ("CI"). See Dkt. No. 49-1 at 24; Dkt. No. 49-2 at 544-49, 592-609, 776-77, 785-86.  Detective Maggy and/or Bell visually observed the controlled buys, and the CIs audio recorded the transactions. See Dkt. No. 49-2 at 565-73, 583-608, 680-85, 688, 702-704, 741, 786-94.  Based on these transactions, on January 11, 2013, the Drug Task Force applied for a warrant to attach a Global Positioning System ("GPS") to petitioner's car, which was granted.  See Dkt. No. 49-1 at 423.  The Drug Task Force monitored petitioner's movements for several weeks.  See Dkt. No. 49-1 at 423-24; Dkt. No. 49-2 at 108, 124-26.

On January 29, 2013, the Drug Task Force staged themselves at different spots across I-87 to conduct a traffic stop of petitioner's vehicle, suspecting that he was carrying drugs.  See Dkt. No. 49-2 at 52-57, 68, 90-91, 108-09, 121-22, 127.  State Troopers Matthew Ross and Matthew Jock assisted.  See id. at 51, 44-46, 51-52, 67, 89.  Petitioner passed Trooper Jock's vehicle, at which time Trooper Jock followed petitioner's car and observed the vehicle speeding and changing lanes without signaling.  See id. at 51-53.  Trooper Jock pulled petitioner's vehicle over, which a female, Chimere Bovian was driving.  See id. at 53, 58; see also Dkt. No. 49-1 at 445.  Trooper Ross and Detective Maggy then arrived on the scene.  See Dkt. No. 49-2 at 53, 58-59, 69-70, 76.  Trooper Ross spoke with petitioner, asked him to exit the vehicle, and conducted a canine search of the vehicle.  See id. at 71-73, 97-98.  Trooper Ross' canine positively alerted to the presence of narcotics at the front passenger window and seat of the vehicle, where petitioner had been sitting.  See id. at 72-74.  Simultaneously,

3

Detective Bell was completing a search warrant for petitioner's vehicle and petitioner's and Bovian's persons.  See id. at 76-77, 124, 802-04.

Detective Bell submitted the application for a search warrant.  See Dkt. No. 49-1 at 422-24.  In his affidavit, Detective Bell described the January 9 and 10 controlled buys as well as the application and installation of the GPS.  See id. at 423.  Detective Bell affirmed that the "[d]etails of said controlled buy[s] [were] deposed during an 'in Camera' session held before [the] issuing magistrate on January 29, 2013[.]"  Id. Detective Bell detailed the vehicle's movements that were monitored going in and out of Albany, New York on January 13 and 24, 2013.  See id. at 423-34.  The affidavit then stated that "[o]n January 29, 2013[,] the 2001 Buick Century exited the Albany, N.Y. vicinity and returned to Clinton County New York.  On January 29, 2013[,] a vehicle stop of the 2001 Buick Century was conducted on Interstate 87 in the Town of Plattsburgh by Trooper Matthew Ross[.]"  Id. at 424.  "During the aforementioned [] stop New York State Trooper Matthew Ross conducted a sniff to the exterior of the 2001 Buick with K9 Kelly who alerted positively to the exterior of the vehicle.  Present in the vehicle at the time of the [] stop was Kris M. Wynn and Bovian[,] Chimere."  Id.  Judge Patnode of the Town of Plattsburgh signed the search warrant on January 29, 2013.  See id. at 424.

Petitioner and Bovian were taken to the police station, and Detective Bell arrived with the search warrant.  See Dkt. No. 49-2 at 804-805.  After showing petitioner the search warrant and advising him that the officers were going to conduct a strip search, petitioner removed a plastic bag from his underpants and handed it to Detective Bell. See id. at 805-806.  The contents tested positive for heroin.  See id. at 662.  A felony

complaint was signed on January 29, 2013, for possession of a controlled substance in the third degree.  See Dkt. No. 49-1 at 428.

Following a grand jury proceeding held on May 16, 2013, petitioner was indicted on charges related to the January 9, 10, and 29 incidents.  See Dkt. No. 49-1 at 9-11. An arrest warrant was filed on May 16, 2013, for two counts of sale of a controlled substance in the third degree and two counts of possession of a controlled substance in the third degree for the January 9 and 10, 2013, controlled buys.  See id. at 431.  On May 22, 2013, a transport order was entered by Clinton County Judge Patrick R. McGill which ordered petitioner to be transported to the Clinton County Sheriff's Department from the Plattsburgh City Police Department "on May 28, 2013[,] upon the conclusion of [his] arraignment in said matter; for arrest processing . . . and upon completion thereof shall be returned to the Clinton County jail for safe keeping."  Id. at 435.  Petitioner was arraigned on all five counts on May 28, 2013, at nine o'clock in the morning.  See Dkt. No. 49-2 at 1-7; see also Dkt. No. 49-1 at 436.  An arrest report for the January 9 and 10 controlled buys was completed on May 28, 2013, and at "11:28 – said Defendant was arrested on Clinton County Court Indictment Warrant[.]"  Dkt. No. 49-1 at 436.


**B. Grand Jury Testimony**

Neither party provided the entire grand jury transcript.  See Dkt. No. 38-1 at 2-3; Dkt. No. 49-1 at 418-20, 439, 559-62, 575-77, 628-29; Dkt. No. 56-1 at 6-10, 27-28. Based on the excerpts provided, Detective Maggy testified and identified CI "12-PD-21" as the individual who assisted in conducting the January 9, 2013, controlled buy, and who knew petitioner as "Kaye".  Dkt. No. 56-1 at 9.  Detective Maggy identified CI "12-

PD-22" as the individual who conducted the January 10, 2013, controlled buy, and knew petitioner as "Beloved". Id. at 10. He was asked, "[f]ollowing the two controlled buys into Kris Wynn, did there come a point where you sought a GPS warrant?" Id. at 6. Detective Maggy stated, "[y]es. After performing the controlled buys and also from other information that we had received from other confidential informants that Mr. Wynn/Beloved/Kaye was actively transporting narcotics on a regular basis, sometimes a couple times a week, from the Albany/Schenectady area back to Plattsburgh." Id. at 6-7. He explained that "[a]t that point, when Mr. Wynn's vehicle was traveling back, it did trip the geo fence at which time [Bureau of Alcohol, Tobacco, and Firearms] members assembled at the [Drug Enforcement Administration] office and we were going to perform a controlled traffic stop of Mr. Wynn's vehicle." Id. at 8.[5]

Detective Maggy testified that "[b]ased on our monitoring of his movements in the Albany area with the GPS system, we also had been informed from other confidential informants that Wynn was picking up heroin from Albany and that he was going to be traveling northbound back to the Plattsburgh area." Dkt. No. 56-1 at 8. He stated that after the January 29 traffic stop, the officers, petitioner, and Bovian went to the police station, and "Mr. Wynn, he did pull out a large clear plastic bag from his person containing a large bundle of white wax envelopes which I usually contribute to heroin

---

[5] The excerpts provided from the grand jury proceeding are missing a page discussing the GPS monitoring of petitioner's vehicle. See Dkt. No. 49-1 at 419-20; Dkt. No. 56-1 at 7-8. The available testimony asks Detective Maggy how the GPS monitoring "work[s] once it is attached[.]" Dkt. No. 49-1 at 419. Detective Maggy testified that "it is all satellite based. We monitor through a program which is called geo fence, which we all . . ." Id. There is then a missing page. See id. at 419-20; Dkt. No. 56-1 at 7-8. The testimony picks up with Detective Maggy discussing petitioner traveling "back" from the Albany/Schenectady area. Dkt. No. 49-1 at 420; Dkt. No. 56- at 8. Neither the State nor petitioner purport to explain the missing testimony or take issue with its absence. See generally Dkt. Nos. 50, 56.

bags." Id. at 27.  Detective Maggy stated that petitioner "voluntarily gave that to" him. Dkt. No. 38-1 at 2; Dkt. No. 49-1 at 438.

### C. Suppression Hearing

Petitioner sought a hearing to challenge the advisement of his rights, a photo identification, reasonable suspicion and probable cause for the stop and search, the warrantless arrest, the search of his vehicle, and the admissibility of video tape evidence.  See Dkt. No. 49-1 at 15-16.  Judge McGill "reviewed the grand jury minutes for legal sufficiency of the evidence to support the indictment [], and/or for the adequacy of the legal instructions given to the grand jury[.]"  Id. at 17.  He determined that "the presentation and instructions were proper and that legally sufficient evidence was presented to support each count of the indictment."  Id.  Judge McGill then ordered that a hearing be held to address petitioner's suppression and admissibility arguments.  See id. at 18-19.  The State asked Judge McGill to review the recording of the "the oral search warrant application before Judge Patnode of the Town of Plattsburgh on January 29, 2013[]" out of concern that petitioner's "access to the recorded proceeding may result in danger to the Confidential Information involved in the application, or compromise further investigations."  Id. at 20.  Judge McGill reviewed the oral search warrant application in camera and stated that "[t]he recording consists solely of the sworn testimony of Detective Matthew Bell regarding the investigation conducted by the Adirondack Drug Task Force in relation to" petitioner.  Id.  He concluded that "[n]owhere during the testimony is the Confidential Informant, whose drug buys form the basis of the application, identified."  Id. at 21.  Judge McGill ordered that a copy of the oral

search warrant application be produced to petitioner along with "any written applications for any search warrant, or request for installation and utilization of a" GPS.  Id. Subsequently, petitioner's counsel affirmed that he had not received the oral search warrant application and asked that the court order the State's compliance with Judge McGill's order.  See id. at 26-27.

During the suppression hearing Detective Maggy testified that on January 29, 2013, he received a tip from a confidential informant.  See Dkt. No. 49-2 at 106-07.  The tip was that petitioner "was going to be going down state . . . [t]o the Schenectady area to re-up, which means to go down to pick up drugs."  Id. at 107.  Detective Maggy explained that "[t]he confidential informant also stated he/she had – he or she had spoken with Mr. Wynn previously and that he was informed they were going to be traveling back to the Plattsburgh area with narcotics."  Id.  When asked whether "the informant kn[e]w who was going to be in the vehicle[,]" Detective Maggy responded, "Mr. Wynn and the informant also stated possibly he was going to have a female drive because I don't believe he had a license."  Id.

Detective Maggy testified that after the officers, petitioner, and Bovian arrived at the station, Detective Maggy "went downstairs with Miss Bo[via]n."  Dkt. No. 49-2 at 113.  While he was downstairs, "another drug task force member came down and informed [Detective Maggy that] Mr. Wynn did have a rather large amount of heroin secreted in his pants.  And Detective Bell requested that [Detective Maggy] go upstairs to one of the booking offices to meet with him about that."  Id. at 115.  After Detective Maggy went to the evidence room, he testified that he saw Detective Bell with a large

clear plastic bag which contained to smaller plastic bags and several "bundles" contained in white glassine envelopes.  Id. at 115-16.

On cross examination, petitioner's counsel asked Detective Maggy whether he received the tip from the confidential informant on "the same day [as the vehicle stop] or a different day[.]"  Dkt. No. 49-2 at 119.  Detective Maggy stated that he received the tip "the same day.  It was actually earlier in the day.  I don't recall the exact time, but it was several hours prior."  Id.  He testified that he "personally received" the tip.  Id. at 120.  Detective Maggy explained that "[t]he confidential informant contacted me by phone to inform me that he had spoken to Beloved, who he knew as Mr. Wynn, by phone and that he was informed that he was going to be good and he was coming back to Plattsburgh."  Id.  He explained that "'[g]ood' means he was going to have narcotics."  Id.  Detective Maggy stated that "[a]fter receiving the information that I received from of the confidential informant I did converse with . . . I did speak with Detective Bell.  I believe earlier in the day.  Informing him that I had received information from my confidential informant about Mr. Wynn."  Id. at 121.  He testified that by the time the officers were staged along I-87, Detective Bell had already begun drafting the search warrant

> based on all of our information.  The prior control buys that were received through Mr. Wynn, information we had received from other confidential informants that he was trafficking narcotics to the Plattsburgh area, and after the vehicle stop was initiated and [petitioner was] properly identified, that is when Detective Bell informed me that he was in route to the Town of Plattsburgh Court with the search warrant application.

Id. at 124.  Petitioner's counsel asked, "[l]et me get this right.  When the confidential informant speaks to you that morning some time before noon, you knew to be on the

lookout for the vehicle coming north, correct?"  Id.  Detective Maggy responded, "Exactly."  Id.

Trooper Ross testified that he decided to use his canine, Kelly, to search the vehicle because "[d]uring [the] conversation with Mr. Wynn, he made a statement about going to an address in Peru.  He was now north of Exit 35 where you would get off to go to that address.  I just believed there was more going on."  Dkt. No. 49-2 at 101.  He then used his canine "to search the exterior of the vehicle."  Id. at 72.  "She alerted to the front passenger window of the vehicle."  Id. at 73.  Then, he "opened the passenger door of the vehicle.  Allowed Kelly in the vehicle.  She alerted once inside the vehicle to the passenger seat of the vehicle.  The front passenger seat of the vehicle."  Id. Trooper Ross testified that after arriving at the police department, Detective Bell arrived, informed petitioner that he had a search warrant, and showed it to petitioner.  See id. at 78-79.  Petitioner stated that he was in possession of something, "[h]e was unhandcuffed[,] and he removed a plastic baggy from the front of his pants."  Id. at 79. Petitioner handed the "baggy" to Detective Bell.  Id.

Following the suppression hearing, Judge McGill's decision recited the findings of fact, including that Detective Maggy "had been informed by a confidential informant that the defendant would be traveling to Schenectady, New York, for a supply of drugs to sell in Plattsburgh."  Dkt. No. 49-1 at 29-30.  Judge McGill stated that "[t]he Confidential Informant also told Maggy that the defendant would have a female driver as he had no driver's license."  Id. at 30.  Judge McGill concluded that the officers

> had reasonable suspicion to believe that [petitioner] was carrying drugs,
> thus the initial stop of the vehicle was appropriate.  Further, the stop was
> supported by the traffic infractions of failure to signal lane change and
> driving over the speed limit.  After the stop, the defendant was properly

> taken into custody, in that there was probable cause for his arrest based
> upon the GPS, the information given by the confidential informant (which
> was confirmed by the GPS information and the observations of the police),
> and by the dog alert.

Id. at 34.  Judge McGill ordered the State to provide the court with an affidavit "as to

whether disclosure [of the search warrant application] will put the informants in a

dangerous situation or [] interfere with an identifiable on-going investigation."  Id. at 36.

### D. Trial

Detective Maggy testified at trial.  See Dkt. No. 49-2 at 527.  Detective Maggy

identified Danny Peters and Jason Sawyer as the CIs who assisted with the January 9

and 10, 2013, controlled buys.  See id. at 544-74, 592-93.  Detective Maggy testified

that "based on the two controlled buys[,] we did apply for a GPS search warrant on

[petitioner's] vehicle . . . to monitor the movements of the vehicle, basically to establish if

we could identify where Mr. Wynn was picking up narcotics, to track his movements."

Id. at 641-42.  On direct examination, Detective Maggy did not discuss receiving a tip

from a CI on January 29, 2013.  See id. at 648-51.  He later testified that after going to

the police station following the traffic stop, he received the narcotics from Detective Bell

after they were recovered from petitioner.  See id. at 663-64.

During cross examination,  Detective Maggy testified that on January 29, 2013,

"the first time that [he] came in contact with [the narcotics] was down in the ID office at

the city police station."  Dkt. No. 49-2 at 738.  The following exchange occurred:

> Q: Do you remember having testified in front of the grand jury?
>
> A: I do.
>
> Q: Okay. That was back on May 15 of last year, correct?

A: That is correct.

Q: When you testified – do you recall whether you testified in front of the grand jury that you testified that you were present in the booking room when Mr. – when the white wax envelopes were taken from the person of Mr. Wynn?

A: I did review my testimony from the grand jury, and I did note that in my testimony at grand jury that there was something to the effect that I took – that I took possession of 109 envelopes. The first time that I did take possession of the 109 envelopes was in the ID office at the city police station.

Q: So is it fair to say that when you testified in front of the grand jury that information that you gave them concerning that point was inaccurate?

A: I wouldn't say inaccurate. I would say that was – basically what I did when I gave testimony, I was basically stating that I received the evidence, the 109 white wax envelopes in my possession at the police station.

Q: Didn't you described to the grand jury having been in the booking room when the 109 packets were initially produced to the grand jury when you were testifying for them?

A: No. What I testified to – my first time that I went upstairs after seeing the 109 white wax envelopes, which I received downstairs at the ID office, I then went back upstairs and entered the booking room where Mr. Wynn was.

Q: So you didn't observe Mr. Wynn in possession of those items, correct?

A: No, sir.

Dkt. No. 49-2 at 738-40.

Detective Bell also testified at trial that after the traffic stop, he was informed that petitioner and the female were present in the vehicle and that Detective Ross' canine "alerted to the exterior of the vehicle while conducted a free-air sniff." Dkt. No. 49-2 at 802. He stated that based on that information, he applied for a search warrant. See id.

at 803-03.  He testified that "[b]ased on our investigation, it was my belief that the defendant was transporting heroin back to Plattsburgh."  Id. at 803.  On cross examination, Detective Bell testified that that he wished for the stop to "[p]referably" occur in Plattsburgh and that he "had part of the [warrant] application already done prior to even arriving to the office in anticipation that the defendant was going to be transporting narcotics back to Plattsburgh."  Id. at 829-30.  It was his "belief at some point following the placement of the GPS unit on the defendant's vehicle he was going to travel back down to the Schenectady vicinity, do something which we call Re-up.  Re-up means to get more narcotics and travel back to Plattsburgh to sell them."  Id. at 832.  He said that he "was in charge of how the investigation was going to go, and [he] did not [apply for the warrant earlier] because [he] had a purpose for not obtaining the warrant until the defendant traveled back to Plattsburgh."  Id. at 832-33.

Both CIs, Peters and Sawyer, testified concerning their respective controlled buys of cocaine and heroin, on January 9 and 10, 2013.  See Dkt. No. 49-2 at 843, 849, 870-71, 877-78.  Neither testified to having any interaction or discussion with Detective Maggy on January 29, 2013.  See id. at 843, 849, 870-71, 876-78.

After the close of trial, the jury was released for deliberations, but returned with the question: "[w]hat constitutes legal probable cause?  Does ongoing investigation allow for stop on the 29th with no traffic infraction?  Is this a legal search?"  Dkt. No. 49-2 at 1136.  The judge explained to the attorneys that he was going to tell the jury that the probable cause determination was made following the suppression hearing and they did not need to concern themselves with it.  See id. at 1137.  Petitioner's counsel stated that he disagreed that probable cause existed to support the January 29, 2013, stop.

See id. at 1137-39.  The Court stated that petitioner's counsel's "interpretation of the facts . . . doesn't negate the findings of the Court back when he heard the testimony on it."  Id. at 1139.  The Judge then explained to the jury that probable cause "isn't a concern you should have.  The Court ruled on this earlier, and that's been indicated in both the – in the summations at least."  Id. at 1140.  Judge McGill stated that "[t]his Court decided that issue based on a hearing conducted before the trial started, and just so that you are aware the Court wrote at that time, [b]ased upon the totality of the information known to the police officers they had a reasonable suspicion to believe that the defendant was carrying drugs, and thus, the initial stop of the vehicle was appropriate."  Id.  The jury subsequently found petitioner guilty on all five counts charged in the indictment.  See id. at 1141-43.

### E.  Direct Appeal

Petitioner filed his notice of appeal from his conviction and sentence on April 17, 2014.  See Dkt. No. 49-1 at 14.  On an unknown date, petitioner moved to obtain the transcript from the grand jury proceeding and to enlarge the record on appeal.  See id. at 451.  The Appellate Division denied petitioner's motion on March 1, 2016.  See id.  In his counseled appeal, petitioner argued that the police lacked probable cause to arrest him and that the subsequently seized evidence should have been suppressed.  See id. at 106.  Specifically, petitioner argued that the GPS and the canine alert did not provide probable cause for his arrest.  See id. at 110; 108-10.  Petitioner also argued that the confidential informant's tip did not provide probable cause to support the warrantless arrest because "the County Court did not recount the tip that allegedly led to probable

cause for Wynn's arrest[,]" and the tip provided no information about when or where

petitioner was going to transport narcotics or what vehicle he would be driving.  Id. at

111.  Petitioner argued that the State "adduced no evidence at the suppression hearing

to show that the informant was reliable in the past.  There was no evidence at the

hearing to corroborate the informant's allegation."  Id. at 111-12.

The Supreme Court, Appellate Division of the Third Department affirmed

petitioner's conviction and sentence.  See Wynn, 52 N.Y.S.3d at 141.  The court

determined that "the state trooper had probable cause to believe that the driver had

committed two traffic violations and he was therefore authorized to stop the vehicle on

that basis, regardless of any other underlying motivation[.]"  Id. at 139.  Further, the

court stated that "[n]otwithstanding the traffic violations, the wealth of information arising

from the controlled buys, the court-authorized GPS monitoring of defendant's vehicle

and the validated tip from one of the CIs regarding defendant's purposeful travels that

day, all established probable cause to detain defendant[.]"  Id.  The court explained that

"the canine alert compounded the suspicion of narcotics possession and provided

additional justification for defendant's detention[.]"  Id.  The Appellate Division next

stated that

> with regard to the two controlled buys, we reject defendant's contention
> that either or both of the CIs were insufficiently reliable.  Although both CIs
> had criminal backgrounds, histories of drug abuse and received favorable
> treatment from the People for their cooperation, the record shows that
> both were fully cross-examined at trial. Defendant has failed to
> demonstrate that their testimony was "inherently incredible or
> improbable[.]"

Id. at 140 (citation omitted).  The court did not discuss the reliability of the alleged

January 29, 2013, informant.  See id. at 139-41.

Petitioner filed a counseled motion for leave to appeal to the Court of Appeals. See Dkt. No. 49-1 at 346, 364-83. Petitioner argued that the GPS and canine sniff did not give the officers probable cause for his arrest. See id. at 367-68. Petitioner also restated his argument concerning the reliability of the January 29 confidential informant. See id. at 369-70. The Court of Appeals summarily denied petitioner's motion. See id. at 388-89. Petitioner, pro se, moved for reconsideration of the Appellate Division's decision, see Dkt. No. 49-1 at 348-56, which was denied. See id. at 387.

**F. Post-Conviction Motions**

On an unknown date, petitioner instituted an Article 78 proceeding. See Dkt. No. 49-1 at 415. The Clinton County Court "issued an order to show cause[.]" Id. In response to the show cause order, the State affirmed that "[t]he only confidential informants utilized in providing information in this case were Informants Peters and Sawyer, and . . . no written documentation exists as to the. . . conversations that they had with Detective Maggy." Id. at 416. On June 20, 2016, Chief of the Clinton County Police Desmond Racicot, completed a sworn affidavit in support of the City of Plattsburgh's response to petitioner's Freedom of Information Law ("FOIL") request as part of his Article 78 proceeding. See id. at 425-26. In his affidavit, Chief Racicot stated that

> in response to Mr. Wynn's first demand for "a copy of any redacted
> portions of an affidavit or statement attributed to confidential informant(s)
> who have involvement in indictment #51-I-13103 other than (CI)12PD21
> and (CI)12PD22" that no other CIs were involved and therefore no
> additional affidavit or statement could be provided in response to this
> demand. . . . In response to Mr. Wynn's third demand for a "copy of any
> (GPS) documents derived directed from GEO fence . . . the City Policy
> Dep't is not in possession of any GPS document deriving directly from

16

GEO fence, other than those documents submitted to the Court requesting a Court order authorizing the placement of the GPS device.

Id. at 425-26.  In April 2019, the Clinton County District Attorney denied petitioner's appeal from his FOIL request for "[t]he Order directing that . . . indictment [] 54-I-1301 be filed as a sealed instrument" and "[d]ocuments and records that reflect the Clinton Co. Dist. Atty's request for the issuance of [a superior court warrant of arrest][.]"  Id. at 432.  The FOIL Appeals Officer stated that the documents "do not exist."  Id. at 432.

In September 2019, petitioner moved to vacate the judgment pursuant to New York Criminal Procedure Law ("CPL") § 440.10.  See Dkt. No. 49-1 at 390-411, 458-505.  Petitioner argued that Chief Racicot's affidavit confirmed that there was no confidential informant tip on January 29, 2013; counts one through four of the indictment concerning the January 9 and 10 controlled buys were improperly presented to the grand jury; the fifth count of the indictment concerning the January 29, 2013, incident was inappropriately obtained because Detective Maggy proffered false testimony to the grand jury; and petitioner was deprived of effective assistance of counsel.  See id. at 391-92.  Clinton County Court Judge Keith M. Bruno denied petitioner's motion under CPL 440.10(2)(a) because he had raised his ineffective assistance of counsel claim on direct appeal and because the "Appellate Division specifically ruled the totality of the evidence 'established probable cause to detain the defendant[.]'"  Id. at 540.  Judge Bruno also concluded, "[s]ince the actions of the law enforcement officers was [sic] lawful, the Court's jurisdiction over the defendant was likewise proper."  Id. at 541.

Petitioner moved for leave to reargue, which Judge Bruno denied.  See Dkt. No. 49-1 at 542-55, 705-708.  Petitioner moved for leave to appeal the denial of his motions

to vacate and to reargue.  See id. at 598-611, 710-15.  The Appellate Division denied

petitioner's motions.  See id. at 677, 726.


## II. Discussion[6]

### A. Legal Standard

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"),

"when a state court has already ruled on the merits of the habeas petitioner's claim, he

must show that decision was either" "(1) 'contrary to' or an 'unreasonable application of'

clearly established federal law, as determined by the decisions of th[e Supreme] Court,

or (2) based on an 'unreasonable determination of the facts' presented in the state-court

proceeding."  Brown v. Davenport, 142 S. Ct. 1510, 1519 (2022)  (quoting 28 U.S.C.

§ 2254(d)).  This is a "difficult to meet" and "highly deferential standard" for evaluating

state-court rulings, which "demands that state-court decisions be given the benefit of the

doubt[.]"  Cullen v. Pinholster, 563 U.S. 170, 181 (2011) (citations omitted)

"A claim is 'adjudicated on the merits' if the state court ruled on the substance of

the claim rather than on a procedural ground."  Jordan v. Lamanna, 33 F.4th 144, 150

(2d Cir. 2022) (quoting Sellan v. Kuhlman, 261 F.3d 303, 311 (2d Cir. 2001)), pet. for

cert. filed, Jordan v. New York, 2017 WL 4404972 (U.S. Nov. 2022).  A state court

"decision is 'contrary to' clearly established federal law 'if the state court arrives at a

conclusion opposite to that reached by [the Supreme] Court on a question of law or if

---

[6] All unpublished opinions cited in this Report-Recommendation and Order, unless otherwise noted, have
been provided to petitioner.

the [it] decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts.'" Id. (quoting Williams v. Taylor, 529 U.S. 362, 413 (2000)). "A decision is an 'unreasonable application' of clearly established federal law 'if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.'" Id. (quoting Williams, 529 U.S. at 413). "A writ cannot be granted 'simply because . . . the relevant state-court decision applied clearly established federal law erroneously or incorrectly[]'"; "[r]ather, whether a decision is 'contrary to' or an 'unreasonable application of' clearly established federal law is a 'substantially higher threshold' than mere incorrectness." Id. (citations omitted). Further, a state court's factual findings are presumed correct, unless that presumption is rebutted by clear and convincing evidence. 28 U.S.C. § 2254(e)(1). If the state court did not decide a claim "on the merits," the pre-AEDPA standard of review applies, and both questions of law and mixed questions of law and fact are reviewed de novo. Washington v. Shriver, 255 F.3d 45, 55 (2d Cir. 2001).

## B. Fourth Amendment Claim (Ground One)

### 1. Parties' Arguments

Petitioner's first assignment of error contends that his arrest was unconstitutional under the Fourth Amendment as the officers lacked probable cause to arrest him because (1) the alleged tip from a confidential informant on January 29, 2013, does not exist; (2) no GPS data was ever produced; and (3) the canine alerted to the presence narcotics, but no narcotics were recovered from the vehicle. See Pet. at 5-6. Petitioner

19

asserts that this lack of probable cause also violated his substantive due process rights under the Fourteenth Amendment because following the suppression hearing, Judge McGill determined that there was probable cause for the arrest based on this fraudulent and/or insufficient information.  See id. at 5-6.  Petitioner notes that Detective Maggy identified Daniel Peters and Jason Sawyer as the CIs who conducted the January 9 and 10, 2013, buys, but did not identify the individual who provided the January 29, 2013, tip.  See id. at 6.  Petitioner also relies on Detective Maggy's testimony that he received information from "other" CIs.  Pet. at 6; see Dkt. No. 49-1 at 418, 420.  Petitioner advances Chief Racicot's affidavit, which states that aside from Peters and Sawyer, there were no other CIs involved in the investigation, and that the police department does not possess any GPS documents.  See Pet. at 6; see also Dkt. No. 49-1 at 425-26.

Respondent argues that petitioner's claims are barred by Stone v. Powell, 428 U.S. 465 (1976).  See Dkt. No. 50 at 21.  Specifically, respondent asserts that "petitioner was afforded extensive opportunities to pursue his Fourth Amendment claim, which he took full advantage of[.]"  Id. at 23.  Respondent notes that petitioner sought and received an evidentiary hearing and raised the Fourth Amendment claim in his direct appeal and motion to vacate.  See id.  As to petitioner's due process claim, respondent argues that because it "boils down to a complaint about the state courts' denial of his Fourth Amendment right, the claim is barred by *Stone*."  Id. at 24.

In his traverse, petitioner concedes that his due process claim is essentially a Fourth Amendment claim but argues that the *Stone* bar is overcome because there was an "unconscionable breakdown" in the state court's corrective process that resulted in

the Fourth Amendment violation.  Dkt. No. 56 at 5, 9.  Petitioner asserts that the

"breakdown" occurred where the State used Detective Maggy's "perjured testimony"

concerning the January 29 confidential informant.  Id. at 9-12.


### 2. Analysis

Stone v. Powell mandates that "where the State has provided an opportunity for

full and fair litigation of a Fourth Amendment claim, the Constitution does not require

that a state prisoner be granted federal habeas corpus relief on the ground that

evidence obtained in an unconstitutional search and seizure was introduced at his trial."

428 U.S. at 482.  Stone requires only that the petitioner be given an "opportunity" to

litigate his or her Fourth Amendment claim.  McPhail v. Warden, Attica Corr. Facility,

707 F.2d 67, 69 (2d Cir. 1983) (citing Gates v. Henderson, 568 F.2d 830, 837 (2d Cir.

1977) (en banc)) ("This court, sitting en banc, has made clear that a fourth amendment

claim may not be considered by a federal habeas corpus court if the state has provided

an opportunity fully and fairly to litigate it.").  Thus, as petitioner and respondent

acknowledge, habeas review is available "(a) if the state has provided no corrective

procedures at all to redress the alleged Fourth Amendment violations; or (b) if the state

has provided a corrective mechanism, but the defendant was precluded from using that

mechanism because of an unconscionable breakdown in the underlying process."

Capellan v. Riley, 975 F.2d 67, 70 (2d Cir. 1992) (citing Gates, 568 F.2d at 840); see

also Dkt. No. 50 at 21-22; Dkt. No. 56 at 7-9.

As to the first prong of the Stone test, petitioner concedes that there was an

available corrective mechanism in State court, which he took advantage of in the form of

a suppression hearing.  See Dkt. No. 56 at 9 ("[S]ince [] petitioner has already outlined

that the state court has provided corrective procedures to redress his Fourth

Amendment claim, he must establish that, though the state provided a corrective

mechanism to rectify his claim," that there was an unconscionable breakdown in the

process); see also James v. Superintendent, No. 9:18-CV-0864 (BKS/CFH), 2021 WL

4482756, at *3 (N.D.N.Y. Sept. 13, 2021) (citations omitted) (denying habeas corpus

review on Fourth Amendment claim where the "petitioner availed himself of a

suppression hearing and was upset with its result, as well as the outcome of his

subsequent appeal.  However, disagreement with the state court outcome is insufficient

to warrant habeas review.  Instead, what is relevant is access to the opportunity to

litigate the Fourth Amendment claims: an opportunity which petitioner both had

available to him and pursued."), report and recommendation adopted, 2021 WL

4477090 (N.D.N.Y. Sept. 30, 2021).  As the State provided a corrective mechanism to

address petitioner's Fourth Amendment claim, the Court may only review the merits if

there was an "unconscionable breakdown" in the process.  Capellan, 975 F.2d at 70.

    "An unconscionable breakdown in the underlying process occurs when 'the

totality of state procedures allegedly did not provide rational conditions for inquiry into

federal law.'"  Cepeda v. Morton, No. 19-CV-2444 (JGK), 2020 WL 6382052, at *5

(S.D.N.Y. Oct. 30, 2020) (quoting Capellan, 975 F.3d at 70), appeal dismissed, No. 20-

3873, 2021 WL 1964767 (2d Cir. May 13, 2021).  "Habeas review is precluded where

the state proceedings had 'a corrective appellate or collateral procedure that fairly

determined that constitutional violations did not occur.'"  Id. (quoting Capellan, 975 F.3d

at 70).  When discussing what constitutes an unconscionable breakdown, courts often

turn to Paul M. Bator's <u>Finality in Criminal Law & Federal Habeas Corpus for State Prisoners</u>, 76 HARV. L. REV. 441 (1963).  <u>See</u>, <u>e.g.</u>, <u>Capellan</u>, 975 F.2d at 70 ("Although our decision in *Gates* did not fully expand on precisely when an unconscionable breakdown has occurred, citations within *Gates* to *Frank v. Mangum*, 237 U.S. 309 (1915), and to Paul M. Bator, *Finality in Criminal Law and Federal Habeas Corpus for State Prisoners*, 76 Harv. L. Rev. 441 (1963) . . ., illustrate the sort of 'disruption or obstruction of a state proceeding' typifying an unconscionable breakdown."); <u>Calderon v. Perez</u>, No. 10-CV-2562 (GBD/AJP), 2011 WL 293709, at *32 (S.D.N.Y. Jan. 28, 2011) (citing Bator's law review article when discussing Fourth Amendment claim in habeas petition), <u>report and recommendation adopted</u>, No. 10-CV-2562 (GBD/AJP), 2011 WL 1405029 (S.D.N.Y. Apr. 5, 2011); <u>Joyner v. Uhler</u>, No. 20-CV-02874 (JPC/SN), 2021 WL 6288849, at *3 (S.D.N.Y. July 8, 2021) (same), <u>report and recommendation adopted</u>, 2021 WL 5741386 (S.D.N.Y. Dec. 1, 2021); <u>Mobley v. Kirkpatrick</u>, 778 F. Supp. 2d 291, 302-03 (W.D.N.Y. 2011) (same).

Bator explained

> if it is alleged on habeas corpus that the trial judge was bribed or that a mob dominated the trial or that the prisoner was tortured to plead guilty (or, to give another instance, that there was knowing use of perjured testimony by the prosecution), and the state provided no fair process, direct or collateral, for the testing of these allegations themselves, the habeas court should proceed to inquire into them and, if it finds the allegations true, set aside the trial court's conclusions.

<u>Finality in Criminal Law</u>, 76 HARV. L. REV. at 457.  Following this guidance, for petitioner to evidence an "unconscionable breakdown" based on Detective Maggy's allegedly perjured testimony, petitioner must show that: (1) the testimony was perjured; (2) the government knew that the testimony was perjured and "use[d]" it; and (3) there were no

processes provided by the state for reviewing the allegations of perjury. Id.; see also Singh v. Miller, 104 F. App'x 770, 771-72 (2d Cir. 2004) (summary order) (concluding that the petitioner's Fourth Amendment claim that "the denial of a *Dunaway* hearing deprived him of an opportunity to probe the truthfulness of the statements the informant gave to the arresting officer" was not cognizable on habeas review because the petitioner was permitted "to probe the informant's relationship to the police *and to cross-examine the arresting officer as to his basis for probable cause*"; the trial court allowed the petitioner the opportunity "to seek leave to reopen the suppression hearing *in order to probe the truthfulness of the arresting officer's testimony*;" and the Appellate Division considered and rejected the petitioner's argument.)); see also Papile v. Hernandez, 697 F. Supp. 626, 633 (E.D.N.Y. 1988) (quoting Shaw v. Scully, 654 F. Supp. 859, 863-64 (S.D.N.Y.1987)) ("An 'unconscionable breakdown' of the procedure is proven where petitioner demonstrates that 'no state court . . . conducted a "reasoned method of inquiry into relevant questions of fact and law," or any inquiry at all' into the Fourth Amendment claim."); Cruz v. Alexander, 477 F. Supp. 516 (S.D.N.Y 1979) (determining that an unconscionable breakdown occurred because "through a series of mischances, neither the New York Supreme Court at trial nor the New York Court of Appeals on review ever addressed the merits of the Fourth Amendment claims petitioner had tried to assert throughout.").

As an initial matter, it is not clear whether Detective Maggy's testimony was perjured. During his grand jury testimony, Detective Maggy identified Peters and Sawyers by their CI numbers as the two CIs who conducted the January 9 and 10 controlled buys. See Dkt. No. 56-1 at 9-10. He then explained that he applied for a

warrant on January 11, 2013, to attach a GPS device to petitioner's car "[a]fter performing the controlled buys and also from <u>other</u> information that we had received from <u>other</u> confidential informants that Mr. Wynn/Beloved/Kaye was actively transporting narcotics on a regular basis, sometimes a couple times a week[.]"  Id. at 6-7 (emphasis added).  Detective Maggy testified that on January 29, 2013, the "geo fence" was "trip[ped]" and a controlled stop was going to be performed based on, in part, information "from other confidential informants that Wynn was picking up heroin from Albany and that he was going to be traveling northbound back to the Plattsburgh area."  Id. at 8.  During the suppression hearing, Detective Maggy testified that he received a phone call on January 29, 2013, that petitioner was going to travel to Schenectady to pick up drugs and travel back to the Plattsburgh area.  See Dkt. No. 49-2 at 107.

Chief Racicot affirmed that there were no other CIs involved in the investigation besides Peters and Sawyer.  See Dkt. No. 49-1 at 425-26.  Therefore, because Detective Maggy had already identified Peters and Sawyer by their CI numbers, his reference to "others" in his grand jury testimony suggests that there was at least one additional unidentified CI involved in the investigation. Dkt. No. 56-1 at 6-7, 9-10.  In the grand jury proceeding excepts provided, Detective Maggy did not state that he received a phone call on January 29, 2013, and during the suppression hearing, he did not identify, by name or CI number, who called him.  See Dkt. No. 49-2 at 107; 56-1 at 6-8.  Detective Maggy did not use the term "other" during the suppression hearing and it is plausible that Detective Maggy was referring to Peters or Sawyer as the confidential informant who called him on January 29, 2013.  See Dkt. No. 49-2 at 106-07.

Regardless, as to the State's knowledge and use of this testimony, petitioner did not obtain Chief Racicot's affidavit until after trial.  See Dkt. No. 49-1 at 425-26.  There is nothing in the record to indicate that the State had actual knowledge of the alleged falsity of Detective Maggy's statements.  See generally Dkt. No. 49-1.  Petitioner argues that the state prosecutor had knowledge of the perjured testimony "[b]ecause the prosecutor is, by law, charged with knowledge of the facts of the case[.]"  Dkt. No. 56 at 11.

In the context of disclosure of exculpatory evidence under Brady v. Maryland, 373 U.S. 83 (1963), cases have held that knowledge of an investigating officer can be imputed to a prosecutor as "constructive knowledge."  United States v. Bin Laden, 397 F. Supp. 2d 465, 481 (S.D.N.Y. 2005) ("[I]t is clear that the investigating case agents on a particular prosecution are part of the prosecution team; their possession of producible material is imputed to the prosecutor regardless of his actual knowledge.") (citing Kyles v. Whitley, 514 U.S. 419, 438 (1995) (rejecting the argument that a state prosecutor "should not be held accountable . . . for evidence known only to police investigators and not to the prosecutor."); United States v. Morell, 524 F.2d 550, 555 (2d Cir. 1975) (holding government agent to be an arm of the prosecutor where he: (1) actively participated in the investigation; (2) supervised a confidential informant; and (3) sat throughout trial at counsel table with the prosecutors)), aff'd sub nom. In re Terrorist Bombings of U.S. Embassies in E. Afr., 552 F.3d 93 (2d Cir. 2008).  Here, Detective Maggy was intimately involved in the investigative process and would be considered an "arm of the prosecutor."  Morell, 524 F.2d at 555.  Therefore, his knowledge concerning the January 29, 2013, phone call could be imputed to the prosecutor.  See DeChirico v.

Walker, 558 F. Supp. 2d 355, 371 (E.D.N.Y. 2008) (quoting United States v. Avellino, 136 F.3d 249, 255 (2d Cir.1998)) ("[A] 'prosecutor is presumed, however, to have knowledge of all information gathered in connection with his office's investigation of the case[.]'").

However, despite the alleged falsity of Detective Maggy's testimony and the imputed knowledge to the prosecutor, petitioner has not demonstrated an "unconscionable breakdown" in the corrective process because petitioner was able to challenge the validity of his arrest at every stage. Capellan, 975 F.2d at 70. Careful research has revealed no case where a habeas court reviewed the merits of a Fourth Amendment claim because of allegedly perjurious testimony where the petitioner was afforded every opportunity to challenge the alleged statement(s). This is because the focus of the Stone v. Powell inquiry "is access to the opportunity to litigate the Fourth Amendment claims[.]" James, 2021 WL 4482756, at *3; see also Finality in Criminal Law, 76 HARV. L. REV. at 457, n.28 (explaining the primary inquiry as "viewing the state processes in totality, did the state at any time provide meaningful process for the testing of the question whether there was such a [federal constitutional] violation?"). Petitioner had every opportunity to obtain state review of his Fourth Amendment claim, which he took advantage of: he cross examined Detective Maggy at the suppression hearing about the January 29, 2013, phone call; he cross examined Detective Bell about the information used in support of the search warrant; he raised the Fourth Amendment issue on direct appeal; and he raised the Fourth Amendment issue in his motion to vacate. See Dkt. No. 49-1 at 108-10, 540-51; Dkt. No. 49-2 at 119-20, 829-32. Petitioner's disagreement with the state court's conclusions does not permit habeas

27

review.  See Valtin v. Hollins, 248 F. Supp. 2d 311, 317 (S.D.N.Y. 2003) (hearing transcript reflecting habeas petitioner had cross-examined officers concerning the circumstances surrounding his arrest and hearing judge's oral opinion "reflect[ed] a 'reasoned inquiry' into [the petitioner's] claims" and not an unconscionable breakdown in state procedure.); see also Cruz, 477 F. Supp. 516 at 523 (comparing "several Second Circuit decisions in which the court has denied habeas relief because the petitioner had received and taken advantage of an opportunity for full and fair litigation in state courts[]" "with the state courts in the instant case never conducted a hearing or made findings of fact concerning petitioner's claim of illegal wiretapping. Indeed, petitioner was never given the opportunity to raise his claim of illegal wiretapping because his request that the government affirm or deny the existence of wiretapping was repeatedly denied.").

The trial court determined that "[b]ased upon the totality of the information known to the police officers, they had reasonable suspicion to believe that the defendant was carrying drugs, thus the initial stop of the vehicle was appropriate."  Dkt. No. 49-1 at 34. The court stated that "the stop was supported by the traffic infractions of failure to signal lane change and driving over the speed limit."  Id.  "After the stop, the defendant was properly taken into custody, in that there was probable cause for his arrest, based upon the GPS, the information given by the confidential informant (which was confirmed by the GPS information and the observations of the police), and by the dog alert."  Id.  The suppression hearing and decision provided an opportunity for reasoned inquiry into petitioner's challenge to the January 29, 2013, informant.  See Hernandez v. Filion, No. 05-CV-4046 (GWG), 2005 WL 3164063, at *6 (S.D.N.Y. Nov. 29, 2005) (quoting

<u>Capellan</u>, 975 F.2d at 70) (The petitioner's "perjury claim seeks to attack the outcome of the suppression hearing, and that attack does not fit within either of the exceptions to *Stone*. Thus, the allegation that perjury occurred during the hearing does not mean that New York State provided [the petitioner] with 'no corrective procedures at all' to redress the alleged Fourth Amendment violations. . . . Nor can it be said that the alleged perjury caused [the petitioner] to be 'precluded from using' the suppression hearing mechanism.").

Even if the suppression court did not conduct a "reasoned inquiry" into the existence of the January 29 informant, petitioner raised his Fourth Amendment challenge on direct appeal. <u>See</u> Dkt. No. 49-1 at 108, 111-12. The Appellate Division determined that "the state trooper had probable cause to believe that the driver had committed two traffic violations and he was therefore authorized to stop the vehicle on that basis, regardless of any other underlying motivation[.]" <u>Wynn</u>, 52 N.Y.S.3d at 140 (citations omitted) "Notwithstanding the traffic violations, the wealth of information arising from the controlled buys, the court-authorized GPS monitoring of defendant's vehicle and the validated tip from one of the CIs regarding defendant's purposeful travels that day, all established probable cause to detain defendant[.]" <u>Id.</u> (citations omitted). Petitioner's direct appeal provided an opportunity to litigate his Fourth Amendment claim. <u>See</u> <u>Watkins v. Perez</u>, 05-CV-477 (GEL), 2007 WL 1344163, at *23 (S.D.N.Y. May 30, 2007) (citations omitted) (concluding that there was no "unconscionable breakdown" in the state's corrective process where the "[p]etitioner reiterated that argument on appeal and it was rejected by the Appellate Division. She raised the argument again to the New York Court of Appeals, but leave to appeal was

denied."); see also Williams v. Artus, No. 06-CV-0356, 2007 WL 2712338, at *3 (W.D.N.Y. Sept. 13, 2007) ("[U]nder the authority of *Capellan*[,] 975 F.2d at 71, a summary affirmance [by the Appellate Division] in which a Fourth Amendment claim is not explicitly addressed does not prove that the state court failed to conduct an inquiry into the claim and is insufficient to establish that an 'unconscionable breakdown' in the state court's corrective process occurred.").  The motion to vacate also afforded petitioner the opportunity to litigate his Fourth Amendment claim, in which he raised Chief Racicot's affidavit and the alleged falsity of Detective Maggy's testimony.  See Dkt. No. 49-1 at 465-66.

In sum, because petitioner has not shown that the government knew and used perjured testimony and there was available "direct or collateral" review to "test[]" the perjury allegation, petitioner's Fourth Amendment claim is not cognizable on habeas review.  Finality in Criminal Law, 76 HARV. L. REV. at 457; see also McClelland v. Kirkpatrick, 778 F. Supp. 2d 316, 333 (W.D.N.Y. 2011) (citation omitted) (denying habeas review because although the petitioner claimed that an officer committed perjury during a grand jury, suppression hearing, and at trial, the petitioner "can claim only that, in his opinion, the Fourth Amendment issue was incorrectly decided by the state courts. The Second Circuit clearly has held that a petitioner's mere disagreement with the state courts' rulings on his Fourth Amendment issues does not suffice to demonstrate that some type of governmental obstruction amounting to an 'unconscionable breakdown' . . . ."); Lindsey v. Griffin, 16-CV-6119 (KMK/PED), 2019 WL 5605197, at *16-17 (S.D.N.Y. Aug. 20, 2019) (denying the petitioner's Fourth Amendment claim where the state trial and appellate courts both "considered and rejected petitioner's Fourth

Amendment claim as meritless"), report and recommendation adopted, 2019 WL

5593299 (S.D.N.Y. Oct. 29, 2019); Garcia v. Bradt, No. 09-CV-7941 (VB/PED), 2012

WL 2426773, at *12 (S.D.N.Y. Jan. 24, 2012) ("[N]o breakdown in procedure occurred:

[the p]etitioner raised Fourth Amendment arguments through pretrial motion, on direct

appeal, and through post-conviction motion.").  This is the case even if the federal court

would have found differently than the state courts.  See Vega v. Artuz, 97-CV-3775,

2002 WL 252764, at *12 (S.D.N.Y. Feb. 20, 2002) ("A federal court may not judge the

merits of a state court decision, even if the federal court might have decided the issue

differently.").  It is, therefore, recommended that the Court decline to review petitioner's

claim as precluded under Stone v. Powell.


**C.  Sufficiency of Indictment and State Court's Jurisdiction (Grounds Two and**
**Three)**

**1.  Parties' Arguments**

Petitioner argues that the county prosecutor violated his procedural due process

rights when evidence was presented to the grand jury about the January 9 and 10

controlled buys which were not charged in the initial felony complaint.  See Pet. at 8.

Petitioner also contends that because of Detective Maggy's allegedly false grand jury

testimony, the arrest warrant was invalid, and the trial court did not have jurisdiction.

See id. at 10-11.

Respondent argues that these claims are not cognizable because "there is no

federal constitutional right to be indicted by a grand jury prior to trial in a state criminal

action[]" and petitioner's conviction cures any defects in the grand jury and indictment

process.  Dkt. No. 50 at 24.  Respondent contends that to the extent petitioner relies on New York Criminal Procedure laws, any such claims "are non-cognizable for the additional reason that 'errors of state law cannot be repackaged as federal errors simply by citing the Due Process Clause.'"  Id. at 25, n.7 (citations omitted).

## 2.  Analysis

"In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States."  Estelle v. McGuire, 502 U.S. 62, 67-68 (1991); see also Lewis v. Jeffers, 497 U.S. 764, 780 (1990) ("[F]ederal habeas corpus relief does not lie for errors of state law.").  "The Supreme Court has never held that state criminal defendants enjoy a federal constitutional right to an indictment."  McCray v. New York, 573 F. App'x. 22, 24 (2d Cir. 2014) (summary order) (citing Alexander v. Louisiana, 405 U.S. 625, 633 (1972)).  "Challenges to state indictments will merit habeas corpus relief only in the exceptional case where the indictment fails to satisfy the basic due process requirements: notice of the time, place, and essential elements of the crime."  Nordahl v. Rivera, No. 08-CV-5565, 2013 WL 1187478, at *5 (S.D.N.Y. Mar. 21, 2013) (citation omitted).  Petitioner does not challenge the sufficiency of the indictment's "basic due process requirements[.]"  Id.

Petitioner's claims that the prosecutor erred in raising the January 9 and 10 incidents to the grand jury, that the indictment was invalid, and that he was improperly arraigned before arrest are based on New York's Criminal Procedure laws.  See Dkt. No. 56 at 15-17.  They are, therefore, not cognizable claims for habeas review.  See

Carmel v. Graham, No. 6:17-CV-6050 (CJS), 2020 WL 6505168, at *10 (W.D.N.Y. Nov. 5, 2020) (citations omitted) ("[The p]etitioner's contentions that he could not be indicted for crimes that were not included in the felony complaint, that there were deficiencies in the grand jury proceedings, that he did not receive a felony complaint hearing, and that the People were required to have testify at trial all of the persons on their witness list[]" "are [] non-cognizable in this proceeding."); see also Davis v. Mantello, 42 F. App'x 488, 490 (2d Cir. 2002) (summary order) ("Claims of deficiencies in state grand jury proceedings are not cognizable in a habeas corpus proceeding in federal court.").

Petitioner argues that his claims are not based on state laws but "trigger[] core constitutional interests" from the Substantive Due Process clause.  Dkt. No. 56 at 14. However, petitioner cites only New York Criminal Procedure statutes and the New York State Constitution to support his contentions.  See id. at 15-17 (citing C.P.L. §§ 190.55(2), 120.10(1), 210.10).  As his claims are clearly based on state law, they are not cognizable on habeas review.  See May v. Warden, No. 07-CV-2176 (BSJ/GWG), 2010 WL 1904327, at *3 (S.D.N.Y. May 10, 2010) (citations and quotation marks omitted) ("There is no federal constitutional right to a grand jury in a state criminal prosecution, and thus a claim of deficiency in the proceeding is not cognizable in a habeas corpus proceeding.  This rule applies to claims of perjury.  Further adding weight to this finding, a conviction by a petit jury cures any defect in grand jury proceedings."); Lopez v. Riley, 865 F.2d 30, 32 (2d Cir. 1989) ("If federal grand jury rights are not cognizable on direct appeal where rendered harmless by a petit jury, similar claims concerning a state grand jury proceeding are a fortiori foreclosed in a collateral attack brought in a federal court[.]"); see also McKelvey v. Bradt, No. 13-CV-

3527 (CM/DF), 2016 WL 3681457, at *12 (S.D.N.Y. July 6, 2016) ("[T]he rule that deficiencies in grand jury proceedings do not violate any federal constitutional right applies to claims of perjury, and thus any federal claim that [the p]etitioner may be trying to assert regarding the prosecutor's alleged subornation of perjury before the grand jury also cannot be considered in this proceeding. . . . [The p]etitioner was convicted by the petit jury under the reasonable doubt standard, and, therefore, any claimed error in the grand jury proceedings or in the Indictment was harmless as a matter of law."); Mullins v. Graham, No. 17-CV-2958 (MKB), 2018 WL 1187401, at *6 (E.D.N.Y. Mar. 6, 2018) (same); Kappen v. Bell, No. 18-CV-05784 (CBA), 2022 WL 939847, at *6 (E.D.N.Y. Mar. 29, 2022) (citing Lopez v. Riley, 865 F.2d 30 (2d Cir. 1989)) ("False testimony before the grand jury alone is insufficient to state a cognizable claim for habeas review if the petit jury convicts without relying on false testimony."), appeal withdrawn, No. 22-948, 2022 WL 2965807 (2d Cir. June 27, 2022). Accordingly, it is recommended that the Court decline to review the merits.

In any case, "a grand jury may return an indictment for offenses other than those designated at the beginning of the grand jury proceeding." Brown v. Miller, No. 14-CV-938 (LEK/CFH), 2016 WL 6081835, at *17 (N.D.N.Y. June 1, 2016), report and recommendation adopted, 2016 WL 6072397 (N.D.N.Y. Oct. 17, 2016); see also People v. Thomas, 811 N.Y.S.2d 369, 370 (1st Dep't 2006) ("The motion court correctly determined that the notice provisions of CPL 190.50(5) do not obligate the People to provide notice of separate charges presented to a grand jury which are not included in a pending felony complaint. This rule not only applies where the additional charges considered by the grand jury arose from the same incident as those in the felony

complaint, but also where they arise from a separate incident that is not the subject of a felony complaint.").  Further, the petitioner's "jury conviction means that he was guilty as charged, beyond a reasonable doubt, and 'any error in the grand jury proceeding connected with the charging decision was harmless beyond a reasonable doubt.'" Brown, 2016 WL 6081835, at *17 (quoting United States v. Mechanik, 475 U.S. 66, 70 (1986)); see also Pressley v. Bennett, 235 F. Supp. 2d 349, 367 (S.D.N.Y. 2003) (quoting Mechanik, 475 U.S. at 70) ("[C]laims of deficiencies in state grand jury proceedings are not cognizable in a federal habeas corpus review. . . .  [T]he petit jury's subsequent guilty verdict means not only that there was probable cause to believe that the defendants were guilty as charged, but also that they are in fact guilty as charged beyond a reasonable doubt.  Measured by the petit jury's verdict, then, any error in the grand jury proceeding connected with the charging decision was harmless beyond a reasonable doubt.").  Finally, even if CPL § 210.10 was not followed for the production of petitioner for his arraignment, "the fact remains that" petitioner was indicted, arrested, and arraigned on all five counts, "thus securing Supreme Court's jurisdiction over both [him] and the resulting prosecution[.]"  People v. James, 48 N.Y.S.3d 524, 527 (2017). Accordingly, it is recommended that petitioner's second and third claims of error be denied.

## D.  Ineffective Assistance of Trial Counsel (Ground Four)

### 1.  Parties' Arguments

Petitioner argues that his trial counsel was ineffective for (1) failing to investigate the existence and identity of the CI who allegedly spoke to Detective Maggy on January

29, 2013, and the existence of the GPS data; (2) not filing a motion to dismiss the indictment; and (3) failing to impeach Detective Maggy at trial as to the allegedly false testimony concerning the January 29, 2013, CI.  Pet. at 12-13.

Respondent states that the motion to vacate court "erroneously found that petitioner's ineffective counsel claim had been previously determined on the merits, and that the claim was therefore procedurally barred.  The ineffective counsel claim raised in petitioner's CPL § 440.10 motion was based on facts entirely different from those supporting the ineffectiveness claim raised on direct appeal."  Dkt. No. 50 at 26, n.8.  "In addition, the 440 claim was based on matters outside the direct appeal record. Accordingly, this Court should address the claim *de novo*, rather than applying AEDPA deference."  Id. (citations omitted).  As to the merits, respondent argues that trial counsel's performance was not deficient, and that petitioner has not otherwise shown prejudice.  See id. at 28-33.

### 2.  Analysis

As an initial matter, the undersigned agrees with respondent that the ineffective assistance of counsel claims in petitioner's direct appeal were not the same as those raised in his motion to vacate judgment.  See Dkt. No. 50 at 26, n.8; compare Dkt. No. 49-1 at 90 (arguing that trial counsel was ineffective for failing to object to the prosecutor's statements), with Dkt. No. 49-1 at 495-504 (arguing that trial counsel was ineffective for failure to investigate, to make a motion to dismiss the indictment, and impeach Detective Maggy).  As such, petitioner's present ineffective assistance of counsel claims have not been reviewed on the merits and the undersigned will review

them de novo rather than under the AEDPA deferential standard of review.  See Cone v. Bell, 556 U.S. 449, 472 (2009) (citation omitted) ("Because the [state] courts did not reach the merits of [the petitioner's] claim, federal habeas review is not subject to the deferential standard that applies under AEDPA to 'any claim that was adjudicated on the merits in State court proceedings.'  Instead, the claim is reviewed *de novo.*").

The Sixth Amendment mandates that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defence."  U.S. Const. amend. VI.  "[T]he right to counsel is the right to the effective assistance of counsel." McMann v. Richardson, 397 U.S. 759, 771 n.14 (1970) (collecting cases) (citations omitted).  "Under Strickland v. Washington, 466 U.S. 668 (1984), [the petitioner] must show 1) that his attorney's performance 'fell below an objective standard of reasonableness,'" "and 2) that there was prejudice, meaning a 'reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different[.]'"  Tavarez v. Larkin, 814 F.3d 644, 648 (2d Cir. 2016) (quoting Strickland, 466 U.S. at 688).  "To determine whether a counsel's conduct is deficient, '[t]he court must . . . determine whether, in light of all of the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance.'" Lindstadt v. Keane, 239 F.3d 191, 198-99 (2d Cir. 2001) (quoting Strickland, 466 U.S. at 690).

**a.  Investigation into the Confidential Informant and GPS Information**

The "focus in analyzing the performance prong of Sixth Amendment ineffective-assistance-of-counsel claims must be on the reasonableness of decisions when they

were made, not on how reasonable those decisions seem in retrospect." <u>Pavel v.</u>
<u>Hollins</u>, 261 F.3d 210, 217, n.9 (2d Cir. 2001) (citing <u>United States v. Bayless</u>, 201 F.3d
116, 130 (2d Cir. 2000)). "In preparing for trial, [c]ounsel has a duty to make reasonable
investigations or to make a reasonable decision that makes particular investigations
unnecessary." <u>Schulz v. Marshall</u>, 528 F. Supp. 2d 77, 95 (E.D.N.Y. 2007) (quoting
<u>Lindstadt</u>, 239 F.3d at 199) (quotation marks omitted) (alteration in original), <u>aff'd</u>, 345
F. App'x 627 (2d Cir. 2009) (summary order). "[A] petitioner has the 'burden of
providing the court sufficiently precise information, that is, a comprehensive showing as
to what the investigation would have produced.'" <u>Heron v. Griffin</u>, No. 18-CV-00004
(JFB), 2019 WL 1050011, at *13 (E.D.N.Y. Mar. 5, 2019) (quoting <u>Taylor v. Poole</u>, No.
07-CV-6318 (RJH/GWG), 2009 WL 2634724, at *14 (S.D.N.Y. Aug. 27, 2009), <u>report</u>
<u>and recommendation adopted</u>, 2011 WL 3809887 (S.D.N.Y. Aug. 26, 2011)); <u>see also</u>
<u>DeJohn v. United States</u>, No. 5:05-CR-347(NAM), 2014 WL 12691146, at *10 (N.D.N.Y.
Nov. 19, 2014) (quoting <u>Taylor</u>, 2009 WL 2634724, at *14 ("[A] petitioner must do more
than make vague, conclusory, or speculative claims as to what evidence could have
been produced by further investigation.").

       Petitioner has not shown that trial counsel's pre-trial investigative performance
was deficient. <u>See</u> <u>generally</u> Pet. As to the alleged tip from an unidentified CI on
January 29, 2013, trial counsel attempted to uncover the identities of any confidential
informants involved in the case prior to trial. Counsel sought an evidentiary hearing
challenging the legality of petitioner's warrantless arrest. <u>See</u> Dkt. No. 49-1 at 15-16.
Prior to the suppression hearing, Judge McGill reviewed Detective Bell's January 29,
2013, oral search warrant application <u>in</u> <u>camera</u> and concluded that "[n]owhere during

the testimony is the Confidential Informant, whose drugs buys form the basis of the application, identified." Id. at 21.  Thus, Judge McGill ordered that the oral search warrant application be produced to defendant along with "copies of any written applications for any search warrant, or request for installation and utilization of a Global Positioning System, and order related thereto[.]"  Id.  Following the suppression hearing, trial counsel submitted an affidavit stating that the People had not turned over the oral application or any copies of written applications for a search warrant or request for installation of GPS and moved the court to direct compliance.  See id. at 26-27.  Judge McGill, in ruling on the issues presented during the suppression hearing, stated that "[t]he People must, however, provide this Court with an affidavit, *in camera*, from a person with knowledge, as to whether disclosure will put the informants in a dangerous situation or will interfere with an identifiable on-going investigation."  Id. at 36.  Judge McGill stated that "[t]he affidavit must include specific factual averments from the informants or a police officer."  Id.  There is nothing more in the record addressing the oral search warrant application.  See generally Dkt. Nos. 49-1; 56.  Further, during the suppression hearing, trial counsel cross-examined Detective Maggy about the January 29 phone call.  See Dkt. No. 49-2 at 107, 119-20.

As respondent states, "[d]espite counsel's efforts, the court apparently did not order the People to disclose the CI[]s['] identities until the first day of trial."  Dkt. No. 50 at 29; see also Dkt. No. 49-2 at 199 (Trial counsel stating that "Mr. Peters' name was only presented to me about a minute before that on the witness list[.]").  Taken as a whole, trial counsel's efforts to obtain the identity of the confidential informant(s) and further information about the phone call was reasonable under the circumstances.  See

Thomas v. Morgenthau, No. 01-CV-1365 (NRB), 2003 WL 221738, at *5 (S.D.N.Y. Jan. 31, 2003) (determining that trial counsel was not ineffective because "trial counsel did diligently endeavor to discover the informant's identity and to challenge his reliability.").

Petitioner, in asserting that the January 29, 2013, confidential informant does not exist, primarily relies on Chief Racicot's 2015 affidavit. See Pet. at 12-13; see also Dkt. No. 56 at 23. Trial counsel did not have this affidavit and there was nothing in the record to indicate that Detective Maggy falsified the tip he received on January 29, 2013. See Dkt. No. 49-1 at 426. Rather, Judge McGill affirmed the arrest as supported by probable cause. See Dkt. No. 49-1 at 34-36. This was then affirmed on direct appeal and on petitioner's motion to vacate judgment. See id. at 540-41; see Wynn, 52 N.Y.S.3d at 139. Petitioner has not explained the reasonable steps trial counsel could have taken to uncover the truth of Detective Maggy's statements beyond requesting the identification of the informant(s) and seeking to review the recorded oral search warrant application. See Dkt. No. 56 at 22-25; see also Greiner v. Wells, 417 F.3d 305, 322, n.21 (2d Cir. 2005) (collecting cases to support the contention that "[i]n nearly every case that concludes that counsel conducted a constitutionally deficient investigation, the courts point to readily available evidence neglected by counsel.").

Similarly, as to the GPS information, petitioner has not alleged the existence of any GPS documents. See Pet. at 5-6, 12-13.[7] There is no indication in the record that GPS documents were created from the tracking of petitioner's vehicle. See generally Dkt. No. 49-1. Rather, the officers testified that they monitored the GPS on their iPads and would receive notifications to their phones if petitioner crossed into a certain

---

[7] Petitioner raises trial counsel's failure to investigate the existence of GPS documents in his petition but does not address it in his traverse. See Pet. at 12-13; see also Dkt. No. 56 at 22-25.

territory.  See Dkt. No. 49-2 at 92, 649-51, 799-800, 903.  Petitioner's conclusory statements that such documents exist, and that trial counsel was deficient for not investigating them further, is insufficient to support an ineffective assistance of counsel claim.  See Salcedo v. Artuz, 107 F. Supp. 2d 405, 418 (S.D.N.Y. 2000) ("[The p]etitioner does not even identify specific documents that would have improved the cross-examination.  Without any evidence of relevant documents or what other evidence further investigation would have uncovered, petitioner has failed to demonstrate that his attorney performed below the professional standard."); House v. Miller, No. 02-CV-5379, 2003 WL 23198788, at *14 (E.D.N.Y. Oct. 27, 2003) ("[The p]etitioner also merely speculates that a 'pretrial investigation' of the 'blood-stained' knife would have uncovered evidence that 'could have been used to disprove that the knife admitted into evidence' was not 'the actual weapon involved in the alleged assault[.]' . . . [The p]etitioner's conclusory statement—unsupported by factual averments—that an examination of the bloody knife would have been favorable to the defense, does not support his claim.").

Even if petitioner had shown that counsel's investigation of these issues was deficient, petitioner has not shown prejudice.  See Strickland, 466 U.S. at 694 (The petitioner "must also show prejudice.  [The p]etitioner must show 'that there is a reasonable probability that but for counsel's unprofessional errors, the result . . . would have been different.").  Petitioner has not shown that, had trial counsel investigated the alleged CI tip and GPS data, that the indictment would have been dismissed.  See Salcedo v. Artuz, 107 F. Supp. 2d 405, 418 (S.D.N.Y. 2000) (citation omitted) (explaining that to demonstrate actual prejudice, the "petitioner must establish that

'there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'").  Rather, Judge McGill determined, and the Appellate Division and motion to vacate court affirmed, that the arrest was supported by probable cause based on the totality of the circumstances, including two controlled buys, the traffic violations, and the canine alert.  See Dkt. No. 49-1 at 34-36; see also Wynn, 52 N.Y.S.3d at 139; cf. Wells v. United States, No. 3:07-CV-1740 (JBA), 2010 WL 363339, at *9 (D. Conn. Jan. 25, 2010) ("[T]he investigation [the petitioner] outlines would not likely have caused counsel to change his recommendation that [the petitioner] accept the favorable plea agreement.  To the contrary, based on the government's strong case against [him], none of this purported evidence would have likely caused competent counsel to advise going to trial[.]").  Further, the tip from the CI on January 29, 2013, was not discussed at trial, recorded conversations from the two controlled buys were played for the jury, and petitioner voluntarily turned over the narcotics he possessed on January 29.  See Dkt. No. 49-2 at 550, 583-85, 589-91, 613-15, 619, 805-806.  Based on the foregoing, petitioner has not shown that had trial counsel taken further investigatory actions, there is a reasonable probability of a different outcome.  Thus, it is recommended that the claim be denied.

### b. Motion to Dismiss Indictment

"To establish ineffective assistance of counsel with respect to the failure to make a motion, 'the underlying motion must be shown to be meritorious, and there must be a reasonable probability that the verdict would have been different if the [motion had been granted].'"  United States v. Rodriguez, No. 11-CR-755 (JFK), 2022 WL 2805536, at *5

(S.D.N.Y. July 18, 2022) (quoting United States v. Matos, 905 F.2d 30, 32 (2d Cir. 1990)). "[C]ounsel cannot be faulted for failing to take meritless actions." Atkinson v. Annucci, No. 9:17-CV-00812 (JKS), 2019 WL 974728, at *5 (N.D.N.Y. Feb. 28, 2019) (citing Aparicio v. Artuz, 269 F.3d 78, 99 (2d Cir. 2001) (holding that it is not ineffective assistance where counsel fails to raise meritless claims)).

"[A]n indictment need do little more than to track the language of the statute charged and state the time and place (in approximate terms) of the alleged crime." United States v. Yannotti, 541 F.3d 112, 127 (2d Cir. 2008) (citation omitted). Petitioner does not contend that his indictment was deficient in any of these ways. See generally Pet.; see also generally Dkt. No. 56. Rather, petitioner claims that trial counsel should have moved to dismiss the indictment (1) because he had not yet been arrested for the January 9 and 10 incidents which should not have been presented to the grand jury; and (2) because of Detective Maggy espoused "false testimony[.]" Dkt. No. 56 at 24-26. First, as explained, a prosecutor is entitled to present allegations to a grand jury that are not included in the felony complaint. See supra at 32-36. Therefore, a motion to dismiss the indictment on this ground would not have been meritorious, and trial counsel cannot be faulted for failing to make such a motion. See Moore v. Att'y Gen. of New York, No. 17-CV-0474 (JFB), 2019 WL 3717580, at *10 (E.D.N.Y. Aug. 7, 2019) ("There is no basis to conclude that a motion to reinspect would have been granted or that, if granted, it would have led to dismissal of the indictment. Moreover, it is well settled that a guilty verdict of a trial jury cures a defect in the grand jury proceeding.").

Second, petitioner has not demonstrated that counsel's performance was deficient for failing to move to dismiss the indictment based on Detective Maggy's

testimony.  There is no indication that the trial court would have granted the motion and, perhaps more significantly, petitioner's conviction cured any potential defects.  See United States v. Howard, 216 F.3d 1074 (2d Cir. 2000) (summary order), 2000 WL, 772405, at *3 (Table) ("A district court cannot dismiss an indictment because the prosecution presented unreliable, misleading, or incomplete evidence to the grand jury.").  Further, petitioner has failed to show prejudice because his conviction was obtained without reference to the alleged January 29, 2013, CI tip.  See generally Dkt. No. 49-2; see also Dixon v. McGinnis, 492 F. Supp. 2d 343, 348 (S.D.N.Y. 2007) (denying ineffective assistance of counsel claim despite counsel's failure to timely submit a motion to dismiss the indictment, which was "negligent at best," because trial jury's guilty verdict cured any defect, and the petitioner could not establish prejudice).  As petitioner has failed to show that trial counsel's decision not to move to dismiss the indictment was deficient and prejudicial, it is recommended that the claim be denied.

### c. Impeachment of Witness

"Impeachment evidence is evidence 'having the potential to alter the jury's assessment of the credibility of a significant prosecution witness.'"  United States v. Madori, 419 F.3d 159, 170 (2d Cir. 2005) (quoting United States v. Avellino, 136 F.3d 249, 255 (2d Cir. 1998)).  "When a party proffers a witness whose testimony it desires the jury to credit, the opponent has the right, on cross-examination, to explore the testimony of the witness with an eye toward attacking, eroding, and ultimately destroying the witness' credibility in the eyes of the jury."  Michael H. Graham, Impeachment of Witness—Prior Inconsistent Statements, 21 Am. Jur. Proof of Facts 2d

101 (Oct. 2022). "[D]ecisions whether to engage in cross-examination, and if so to what extent and in what manner, are . . . strategic in nature." United States v. Nersesian, 824 F.2d 1294, 1321 (2d Cir. 1987). "Courts are reluctant to find unreasonable conduct in defense counsel's cross-examination strategy absent grave error falling below the required professional standard." Salcedo v. Artuz, 107 F. Supp. 2d 405, 417-18 (S.D.N.Y. 2000); see also Porter v. McGinnis, No. 9:03-CV-1299 (LEK/GJD), 2007 WL 2789466, at *14 (N.D.N.Y. Sept. 24, 2007) ("[The p]etitioner's disagreement with trial counsel's strategy, even though it proved unsuccessful, is not a basis for habeas relief."); Waiters v. Lee, No. 13-CV-3636 (MKB/SJB), 2020 WL 3432638, at *12 (E.D.N.Y. June 23, 2020) ("Trial Counsel's strategic decision not to impeach on this issue does not give rise to a viable claim of ineffective assistance of counsel."), aff'd, No. 20-2190, 2021 WL 5183539 (2d Cir. Nov. 9, 2021).

Trial counsel attempted to impeach Detective Maggy at trial with his grand jury testimony. See Dkt. No. 49-2 at 738-40. Petitioner is upset that counsel did not continue to push back on Detective Maggy's responses and instead ended his questioning. See Dkt. No. 56 at 27-28. However, cross examination is a trial strategy that is not intended to be second guessed by habeas review. See Salcedo, 107 F. Supp. 2d at 417-18; Waiters, 2020 WL 3432638, at *12; see also Love v. McCray, 165 F. App'x 48, 50 (2d Cir. 2006) (summary order) ("The record [] demonstrates that defense counsel successfully elicited the fact of this discrepancy on his cross-examination of the witness without need for the sketch. Counsel's performance cannot be deemed objectively unreasonable because he failed to pursue cumulative impeachment."). As petitioner has not shown that counsel's cross-examination was

deficient, let alone prejudicial, it is recommended that petitioner's ineffective assistance of counsel claim on this ground be denied.

### III.  Conclusion

For the reasons stated herein, it is hereby:

**RECOMMENDED**, that the petition for a writ of habeas corpus (Dkt. No. 38) be **DENIED IN ITS ENTIRETY**; and it is further

**RECOMMENDED**, that no certificate of appealability be issued with respect to any of petitioner's claims as petitioner has not made a "substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2) ("A certificate of appealability may issue . . . only if the applicant has made a substantial showing of the denial of a constitutional right."); see also Lucidore v. New York State Div. of Parole, 209 F.3d 107, 112 (2d Cir. 2000); and it is

**ORDERED**, that the Clerk of the Court serve a copy of this Report-Recommendation and Order on all parties in accordance with Local Rules.

**IT IS SO ORDERED**.

Pursuant to 28 U.S.C. § 636(b)(1), petitioner has **FOURTEEN (14)** days within which to file written objections to the foregoing report.  Such objections shall be filed with the Clerk of the Court.  **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN (14) DAYS WILL PRECLUDE APPELLATE REVIEW**.  Roldan v. Racette,

984 F.2d 85, 89 (2d Cir. 1993) (citing <u>Small v. Sec'y of Health and Human Servs.</u>, 892

F.2d 15 (2d Cir. 1989)); <u>see also</u> 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 72 & 6(a).[8]

       Dated: December 12, 2022
            Albany, New York

Christian F. Hummel
U.S. Magistrate Judge

---

[8] If you are proceeding <u>pro se</u> and are served with this Report-Recommendation & Order by mail, three (3) additional days will be added to the fourteen (14) day period, meaning that you have seventeen (17) days from the date the Report-Recommendation & Order was mailed to you to serve and file objections. FED. R. CIV. P. 6(d). If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday. <u>Id.</u> § 6(a)(1)(c).